**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

DR. ADAM KALKSTEIN,

Plaintiff,

**COMPLAINT**

vs.

UNITED STATES MILITARY ACADEMY, LT. GENERAL STEVEN W. GILLAND (RET.), in his Official Capacity, BRIG. GENERAL SHANE R. REEVES (RET.), in his Official Capacity, COL. MARK R. READ, in his Official Capacity,

JURY TRIAL DEMANDED

Defendants.

-----------------------------------------------------------------x

This is an action that seeks to protect the fundamental rights of academic freedom and freedom of speech, set forth in the First Amendment to the United States Constitution.

**PARTIES**

1. Plaintiff Dr. Adam Kalkstein is an adult of legal age who resides in the County of Rockland within this judicial district. At all relevant times, plaintiff was employed as a Professor at the United States Military Academy [hereinafter referred to as "West Point" or the academy] which is located within this judicial district.

2. Defendant UNITED STATES MILITARY ACADEMY is a four-year, federally created and funded undergraduate institution which prepares

students to become commissioned officers in the United States Army. The academy is an instrumentality of the United States Department of Defense and within the Department of the Army.

3. Defendant LT. GENERAL STEVEN W. GILLAND (RET.) served as the academy's 61st Superintendent and the commanding officer of the academy and the military post at West Point until August 2026. In this position, he had final responsibility for decisions challenged herein.

4. Defendant BRIG. GENERAL SHANE R. REEVES (RET.) served as the 15th Dean of the Academic Board at West Point and, as such, was responsible for overseeing the academy's academic mission, including oversight of all its academic programs and faculty during the relevant times.

5. Defendant COL. MARK R. READ is the Head, Department of Geography and Earth Sciences at West Point, and so served at all relevant times and was personally involved in all adverse actions alleged herein.

**<u>JURISDICTION AND VENUE</u>**

6. As plaintiff alleges that defendants took adverse actions terminating his employment at West Point because he taught that humans influenced climate change and then protested the directive that this not be mentioned in his classes, thereby violating rights protected by the First Amendment,

this Honorable Court has jurisdiction over this action pursuant to 28 U.S.C. section 1331.

7. The events giving rise to the claims asserted herein occurred primarily in the County of Orange, State of New York, within this judicial district, providing venue in the Southern District of New York under 28 U.S.C. section 1391(b)(2).

## FACTUAL ALLEGATIONS

8. According to West Point's website, "[t]he purpose of USMA's Academic Program is to establish the intellectual foundation for service as a highly educated commissioned officer."

9. The academic program goals include, "Graduates think critically and creatively" and "Graduates reason and act ethically," and "Graduates apply science, technology, engineering and mathematics to solve complex problems."

10. One specific goal ["what graduates can do statements"] is to "apply the scientific method" and to "collect, analyze, and interpret data to inform evidence-based conclusions and evaluate outcomes."

11. One of the academy's stated missions is to "provide intellectual capital to the Army and the nation through faculty, center and cadet research."

12. Another is to "strengthen civil-military relations by engaging with civil society."

13. The academic mission of the academy is directly overseen by the Office of the Dean of the Academic Board, a position held at all relevant times by defendant BG Reeves.

14. The academy's academic program consists of thirteen academic departments, each overseen by an Army Colonel, known as the "head" of the department.

15. Each academic department has a deputy department head, again Army Colonels who assist in overseeing the operation of the department, as well as program directors who oversee specific academic disciplines within each department.

16. The academy employs civilians as faculty members.

17. About 20% of the 500 faculty members are civilians.

18. Before October 1, 2025, Plaintiff, Dr. Adam Kalkstein, was a tenured professor who taught, *inter alia*, climate science at West Point for more than seventeen years.

19. As of May 2025, plaintiff served as a tenured Full Professor of Geography in good standing.

20. Plaintiff's annual appraisals were outstanding, and he consistently received 5/5 on the pillars by and through which West Point evaluates professors.

21. Plaintiff's teaching evaluations were strong; he also had a most robust research agenda, worked closely with cadets, and was in the middle of a large, impactful ~$750k research grant in which he served as the lone Principal Investigator.

22. Plaintiff was among the largest recipients of external research grant funding among professors at the academy.

23. While in the field with students in May 2025, plaintiff's Department Head, defendant COL Read, informed him that his position was being eliminated as part of a reduction in force.

24. Defendant Read made clear that he was implementing a decision made by the Dean's Office, which was overseen by defendant BG Reeves.

25. Only two civilian faculty members at West Point were so reduced in force, and somehow, despite his incredibly strong record, plaintiff was one of them.

26. Although his superior claimed his expertise in climate science had nothing to do with this adverse action, plaintiff disbelieved this because: i) The other person to lose his position did research on bias, another

forbidden area; ii) No analysis ever suggested why plaintiff's department (which already has among the fewest civilian professors) was selected to lose another; iii) plaintiff was advised that West Point wanted to eliminate "civilians associated with centers," but plaintiff knew this was pretextual; iv) plaintiff was aware of the Trump administration's hostility to the accepted scientific notion that human activity was a major cause of present-day climate change.

27. While in the Department of Geography and Earth Sciences, plaintiff was affiliated with the Center for Languages, Cultures, and Regional Studies (CLCRS).

28. But as it eliminated plaintiff's position, West Point opened a massive new Center for the Humanities and specifically noted that more geographers were needed to staff this center.

29. In other words, defendant Read stated plaintiff was cut because he was a civilian in a center while West Point was opening a new center seeking civilians in a nearly identical field.

30. In fact, defendants eliminated plaintiff's position because he taught that current climate change had primarily human causes, something contrary to the ideology of the Commander in Chief and forbidden at West Point.

31. During the summer of 2025, defendants agreed that plaintiff could

remain at West Point as a "term employee" being paid with his grant money.

32. However, to effectuate this, defendants insisted that plaintiff give up his tenured position as Professor of Geography effective October 1, 2025, and forfeit entitlement to a large severance package.

33. By letter dated 23 September 2025, defendant Read extended this proposal to plaintiff.

34. With no options and significant obligations, plaintiff accepted this offer.

35. Meanwhile, on 11 September 2025, plaintiff was called into an emergency meeting for the Geography Program where LTC Joel Radunzel, Geography Program Director, relayed a verbal order that professors could no longer teach about anthropogenic (human-caused) climate change and that professors must remove all mention of human causes of climate change from their courses.

36. During this emergency meeting, LTC Radunzel conveyed defendant Read's guidance which not only included this verbal order, but also a clear threat that if anyone went to the media, politicians, etc., the entire department would likely be dissolved.

37. At the time, plaintiff was teaching two sections of Climatology in which he taught that humans were responsible for much of the current planetary

warming trend and presented the scientific evidence, consequences, and military impacts.

38. Learning how humans affect the atmosphere was a fundamental component of his course which he had been teaching for many years, and the concept that humans can alter Earth's climate is a plainly established scientific fact.

39. Defendant Read spoke with plaintiff later that day. Plaintiff expressed his ethical and legal concerns about omitting vital information from the course. Plaintiff explained that being prohibited from teaching human contributions to climate change crossed a red line for him as a scientist.

40. Defendant Read insisted, "Adam, you have to teach the course."

41. Since plaintiff did not want to inconvenience his colleagues who would have to pick up the slack, he relented the very next day and agreed to teach his courses and comply with the directive.

42. While other professors had to adjust the content of their courses as well, plaintiff was the person most affected since he served as West Point's only climate scientist and the only one who taught Climatology.

43. Shortly after receiving the directive not to mention human contributions to climate change, plaintiff went to the IG's office, which was unhelpful.

44. Plaintiff went to Legal at West Point which sent him several cases supposedly supporting the legality of the order.

45. The plaintiff studied the cases, which clearly showed the exact opposite; all the cases noted that rulings in favor of academic institutions occurred when faculty wanted to teach something obscure.

46. On the contrary, plaintiff had been ordered to omit a massive, fundamental, essential component of the course and to defy science.

47. After plaintiff responded to Legal highlighting this, he never heard from its members again.

48. Finally, plaintiff tried to schedule a meeting with defendant Dean BG Reeves to discuss why this order was problematic.

49. However, defendant Department Head COL Read disallowed plaintiff from meeting with the Dean despite repeated requests.

50. Indeed, defendant Read would not even pass along a letter to the Dean, noting why the order was problematic morally, legally, and militarily.

51. Despite his profound misgivings, plaintiff continued to obey the order.

52. In late October 2025, plaintiff requested that COL Krista Watts, Vice Dean for Operations at West Point, and Dr. Susan Richardson, Vice Dean for Academic Affairs, reinstate his position, explaining that, in no system based on meritocracy, would it have been eliminated.

53. Plaintiff issued this request based on clear guidance issued by the Secretary of War on September 30, 2025 (Modern Workforce Management) highlighting the importance of merit-based decisions on employment.

54. By email dated November 5, 2025, at 9:53 am, acting on behalf of defendants Reeves and Read, COL Watts rejected plaintiff's request, explaining that, while she did not disagree with anything plaintiff had written about his own stellar performance, and noting that defendant Read "is very happy you are still on the team and hopeful that a permanent appointment may be an option in the future," "the decision to cut your position was mission-driven, not performance driven."

55. With this rejection, for and during the 2025-26 academic year, plaintiff served as a term employee subject to reappointment if funds to reimburse his salary were available through external [grant] sources [as they were].

56. By dint of his grants, plaintiff understood he could continue serving indefinitely, and his Department Head COL Read reassured him of this both verbally and in writing (specifically, a signed contract dated 23 September 2025).

57. On November 5, 2025, defendant Dean Reeves met with the Geography Department.

58. Plaintiff's research was highlighted at the meeting.

59. Plaintiff sat at the main table and presented his research to plaudits from the Dean and others.

60. Toward the end of the meeting, one of plaintiff's colleagues presented a PowerPoint which affirmed the department's compliance with the directive not to mention human causes for climate change.

61. As the subject matter expert, the plaintiff then spoke up and explained that this directive violated the mission of the academy as it required professors to hide scientific truth.

62. Plaintiff stated, "I just got out of Climatology class and it's a struggle. It's not a college-level course. It's not even a high school course. Not because it isn't rigorous; it is. But because we're leaving our essential information. We're only telling cadets part of the story. We're lying to them, deceiving them. It would be like trying to teach the law without being able to even mention the Constitution. The guiding principle of any school should be to the truth…I'm supposed to be an educator and a scientist upholding Army values, but sir, right now, I'm a liar and a fraud. What we're doing here is wrong. It's immoral. It's likely illegal…"

63. The Dean responded angrily, querying who set the agenda for West Point.

64. Plaintiff noted that the Commander in Chief did he but needed to act within the Constitution.

65. Defendant Reeves suggested that plaintiff resign from his position.

66. Plaintiff indicated that his personal responsibilities precluded that.

67. Continuing to yell, Defendant Reeves stated that he had seen enough and stormed out of the meeting, again threatening the entire Department if its members did not comply.

68. Plaintiff met with COL Watts the next day to review what had transpired. This meeting was, by all accounts, cordial.

69. Plaintiff also met with defendant Read, along with COL Christopher Fuhriman, Deputy Department Head, where plaintiff expressed his frustration at being blocked from communicating with the Dean earlier.

70. Despite his profound misgivings, plaintiff continued to obey the order and taught Climatology through the fall semester 2025.

71. During the spring semester 2026, plaintiff taught Meteorology and was required to remove a lesson which highlighted climate change.

72. In May 2026, plaintiff briefed final grades to COL Read which is standard procedure before submitting grades.

73. After plaintiff finished speaking, defendant Read said, "Adam, we need to talk about your contract," and continued, "We've decided not to renew your contract past December [2026]."

74. Defendant Read provided plaintiff with letter dated April 27, 2026, which he signed confirming this intention.

75. Given that plaintiff had external funding secured for over a year after that, and given signed contract dated 23 September 2025 noting "This term appointment is funded by reimbursable resources and will be extended subject to the availability of reimbursable funding," and given prior verbal assurances by COL Read, and given no prior warning or indication of poor performance, this came as a total surprise to plaintiff.

76. Knowing that West Point paid none of his salary and that this was a purely vindictive action that ran counter to both written and verbal assurances, plaintiff responded, "You have to be kidding me."

77. Defendant Read justified this action, due to plaintiff's "poor character and temperament," a sentiment never expressed about plaintiff during his entire employment at the academy. In fact, strong character is frequently mentioned throughout plaintiff's 17 years of glowing evaluations.

78. As evidence of plaintiff's poor character, defendant Read referred to 1) the November 5, 2025, meeting with the Dean and 2) the one-on-one

meeting plaintiff had with COL Watts following the referenced meeting with the Dean.

79. In fact, as plaintiff reported to COL Read, the latter meeting could not have been more pleasant (COL Watts is someone plaintiff has known for 14 years, and he later confirmed with her the meeting was completely appropriate).

80. And, at the former meeting, plaintiff expressed consternation about the infringements on his speech and academic freedom imposed by order he received on 11 September 2025.

81. In other words, West Point was fabricating justifications for termination of the plaintiff.

82. Defendants clearly terminated plaintiff because he expressed his opposition to the directive to purge human causes as one of the bases for climate change.

83. This was the "mission driven" reason for eliminating his position, depriving him of tenure, and eventually terminating him after he spoke up objecting to this directive.

84. The directive not to mention human causes for climate change is consistent with other measures to limit free speech and expression by

civilian professors at West Point implemented by defendant Reeves and successfully challenged in *Bakken v. USMA*, 25 cv 07826 (CS).

85. The content-based prohibition on plaintiff's classroom speech serves one purpose: to chill and suppress speech and censor viewpoints contrary to those of the academy, the defendants, the Department of Defense and its leader and the President of the United States.

86. As a professor of Geography, plaintiff's inability to teach factual information concerning the subject he is required to teach is disruptive and stifling to the educational process.

**CLAIMS FOR RELIEF**

87. Plaintiff incorporates paras. 1-86 as if fully re-written herein.

88. First, in May 2025, plaintiff was punished for teaching that human activity contributes to climate change when he was advised that the academy was abolishing his tenured teaching position.

89. Defendants so acted due to the content of the classroom instruction plaintiff offered.

90. By and through this adverse action, defendants violated the First Amendment and plaintiff's rights thereunder.

91. Second, in September 2025, defendants expressly forbade plaintiff from mentioning human contributions to climate change, an essential topic taught in every introductory college-level Climatology class.

92. By and through this directive, defendants violated plaintiff's right to freedom of speech and academic freedom as guaranteed by the First Amendment.

93. Third, after plaintiff challenged this restriction, explaining to defendant Reeves that it made him a fraud and a liar and compelled him to misrepresent to cadets the current state of climate science, and in retaliation for plaintiff's opposition to the imposition of this unconstitutional limitation on his speech, defendants prematurely ended plaintiff's term appointment despite the availability of hundreds of thousands of dollars in remaining grant funds, again violating his First Amendment right to free speech.

94. By and through said course of conduct, defendants caused plaintiff significant material loss and emotional distress.

95. Each of the acts taken by defendants was undertaken in their official capacity.

96. Plaintiff's advocacy concerned a matter of public importance, did not disrupt West Point operations, was in keeping with the alleged values of the academy and concerned matters well beyond any personal to him.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff prays that this court accept jurisdiction in this matter; empanel a jury to hear and decide this matter; permanently enjoin defendants from imposing or enforcing baseless restrictions on academic freedom and the capacity of a professor to fairly represent the state of scientific research and knowledge; order defendants or those acting in their stead to reinstate plaintiff to his position as a tenured professor at the academy; award plaintiff compensatory damages for the material losses he has sustained as well as for the substantial emotional distress caused by defendants' adverse actions as set forth above; award counsel fees and costs associated with the initiation and prosecution of this lawsuit and enter any other and further relief which equity or law requires.

Respectfully submitted,

Michael H. Sussman [3497]

SUSSMAN & ASSOCIATES
Counsel for Plaintiff
PO BOX 1005

1 Railroad Avenue, Ste. 3
Goshen, New York 10924
(845)-294-3991 (ph)
(845)-294-1623 (fax)
Sussman1@sussman.law